Matthew L. Sharp, Esq.
Nevada Bar No. 4746
**MATTHEW L. SHARP. LTD.**
432 Ridge St.
Reno, NV 89501
(775) 324-1500
matt@mattsharplaw.com

Paul J. Doolittle (*pro hac forthcoming*)
**POULIN | WILLEY | ANASTOPOULO**
32 Ann St.
Charleston, SC 29403
(803) 222-2222
paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

*Attorneys for Plaintiff and Proposed Class*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **ADAM EMERSON,** *individually and on behalf of all others similarly situated***,** | |
| Plaintiff, | Case No. |
| v. | |
| **WYNN RESORTS, LIMITED,** | <u>**CLASS ACTION COMPLAINT**</u><br><u>**JURY TRIAL DEMANDED**</u> |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff, Adam Emerson, ("Plaintiff") brings this Class Action Complaint against Defendant, Wynn Resorts, Limited ("Wynn" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to Plaintiff's own actions and to counsels' investigation, and upon information and belief as to all other matters, as follows:

## <u>PARTIES, JURISDICTION & VENUE</u>

1.      Plaintiff Adam Emerson is a resident and citizen of Plano, Texas.  Plano is located within Collin County.

2.      Defendant, Wynn Resorts, Limited is a corporation that develops and operates high-end hotel and casinos, with its principal place of business located at 3131 Las Vegas Boulevard South,

Las Vegas, Nevada 89109.  Las Vegas Boulevard South is located within Clark County.  The Defendant's Registered Agent is C T Corporation Systems, located at 701 S CARSON ST STE 200, Carson City, NV, 89701.

3.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C.§1332, because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000.00, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from each Defendant.

4.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District.  Defendant has also purposefully availed itself of the laws, rights, and benefits of the State of Nevada.

5.     Venue is proper under 28 U.S.C §1391(b) because Defendant maintains a principal place of business in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## STATEMENT OF FACTS

6.     Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard the sensitive personally identifiable information ("PII") of himself and other current and past customers and employees, including, but not limited to: names, dates of birth, Social Security Numbers, tax ID numbers, and financial account information.

7.     Defendant is a globally recognized resort that offers guest experiences including elegant accommodations, world class dining, casinos, entertainment, and personalized service.[1]

8.     On February 20, 2026, it was reported by ShinyHunters that they had 800,000 records containing PII and employee data from Wynn Resorts, Limited[2].

///

///

---

[1] https://www.wynnresorts.com/
[2] https://www.securityweek.com/wynn-resorts-confirms-data-breach-after-hackers-remove-it-from-leak-site/

9.      Plaintiff Adam Emerson is a former employee of Wynn Resorts, Limited.

10.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

11.     The Data Breach was a direct result of Defendant's failure to implement an information security program designed to: (a) to ensure the security and confidentiality of customer and employee information; (b) to protect against anticipated threats or hazards to the security or

integrity of that information; and (c) to protect against unauthorized access to that information that could result in substantial harm or inconvenience to any customer.

12.    An information security program encompasses the administrative, technical, or physical safeguards used to access, collect, distribute, process, protect, store, use, transmit, dispose of, or otherwise handle customer information.  Had Defendant implemented an information security program consistent with industry standards and best practices, it could have prevented the Data Breach.

13.    As a result of the Data Breach, Plaintiff has suffered an actual injury, similar to an intangible harm remedied at common law.  Defendant's failure to implement an information security program resulted in the unauthorized disclosure of Plaintiff's private information to cybercriminals.  The unauthorized disclosure of Plaintiff's PII constitutes an invasion of a legally protected privacy interest, that is traceable to the Defendant's failure to adequately secure the PII in its custody, and has resulted in actual, particularized, and concrete harm to the Plaintiff.  The injuries Plaintiff suffered, as described herein, can be redressed by a favorable decision in this matter.

14.    Defendant has not provided any assurances that: all data acquired in the Data Breach, or copies thereof, have been recovered or destroyed; or, that Defendant has modified its data protection policies, procedures, and practices sufficient to avoid future, similar, data breaches.

15.    Defendant's conduct, as evidenced by the circumstances of the Data Breach, has created a substantial risk of future identity theft, fraud, or other forms of exploitation.  The imminent risk of future harm resulting from the Data Breach is traceable to the Defendant's failure to adequately secure the PII in its custody, and has created a separate, particularized, and concrete harm to the Plaintiff.

16.    More specifically, the Plaintiff's exposure to the substantial risk of future exploitation caused or will cause them to: (i) spend money on mitigation measures like credit monitoring services and/or dark web searches; (ii) lose time and effort spent responding to the Data Breach; and/or (iii) experience emotional distress associated with reviewing accounts for fraud, changing usernames and passwords or closing accounts to prevent fraud, and general anxiety over the consequences of the Data Breach.  The harm Plaintiff suffered can be redressed by a favorable decision in this matter.

17.     Armed with the PII acquired in the Data Breach, data thieves have already engaged in theft and can, in the future, commit a variety of crimes including, opening new financial accounts, taking out loans, using Plaintiff's information to obtain government benefits, file fraudulent tax returns, obtain driver's licenses, and give false information to police during an arrest.

18.     According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[3]    Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[4]

19.     The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you.  Identity thieves can use your number and your good credit to apply for more credit in your name.  Then, they use the credit cards and don't pay the bills, it damages your credit.  You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought.  Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[5]

20.     In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[6] "Someone who has your SSN can use it to impersonate you, obtain credit and open bank accounts, apply for jobs, steal your tax refunds, get medical treatment, and steal your government benefits."[7]

21.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse

---

[3] *See*, https://www.ssa.gov/phila/ProtectingSSNs.htm

[4] *Id.*

[5] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf

[6] *See* https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft/

[7] *See* https://www.investopedia.com/terms/s/ssn.asp

of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

22.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[8]

23.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant . . . . Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."), report and recommendation adopted, No. 3:17-CV-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020); *see also McFarlane v. Altice USA, Inc*., 2021 WL 860584, at *4 (citations omitted) (S.D.N.Y. Mar. 8, 2021) (the court noted that Plaintiff's Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves" because it is immutable and can be used to "impersonat[e] [the victim] to get medical services, government benefits, ... tax refunds, [and] employment." . . . Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] social security number derives its value in that it is immutable," and when it is stolen it can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.")

24.    Similarly, the California state government warns consumers that: "[o]riginally, your Social Security number (SSN) was a way for the government to track your earnings and pay you retirement benefits.  But over the years, it has become much more than that.  It is the key to a lot of your personal information.  With your name and SSN, an identity thief could open new credit and bank accounts, rent an apartment, or even get a job."[9]

---

[8] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft

[9] *See* https://oag.ca.gov/idtheft/facts/your-ssn

25.     As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and increased risk their PII will be further misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access on the dark web or otherwise; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the data.

26.     Plaintiff brings this class action lawsuit individually, and on behalf of all those similarly situated, to address Defendant's inadequate data protection practices and for failing to provide timely and adequate notice of the Data Breach.

27.     Through this Complaint, Plaintiff seeks to remedy these harms individually, and on behalf of all similarly situated individuals whose PII was accessed during the Data Breach. Plaintiff has a continuing interest in ensuring that personal information is kept confidential and protected from disclosure, and Plaintiff should be entitled to injunctive and other equitable relief.

### *Data Breaches Are Avoidable*

28.     Upon information and belief, the Data Breach was a direct result of Defendant's failure to: (i) identify risks and potential effects of collecting, maintaining, and sharing personal information; (ii) adhere to its published privacy practices; (iii) implement reasonable data protection measures for the collection, use, disclosure, and storage of personal information; and/or (iv) ensure its third-party vendors were required to implement reasonable data protection measures consistent with Defendants' data protection obligations.

29.     Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left the data in a dangerous condition.

30.     To detect and prevent cyber-attacks, Defendant could and should have implemented the following measures:

Reasonable Safeguards

    a.   Regularly patch critical vulnerabilities in operating systems, software, and firmware on devices. Consider using a centralized patch management system.

    b.   Check expert websites (such as www.us-cert.gov) and your software vendors' websites regularly for alerts about new vulnerabilities and implement policies for installing vendor-approved patches to correct problems.

    c.   Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks. Depending on your circumstances, appropriate assessments may range from having a knowledgeable employee run off-the-shelf security software to having an independent professional conduct a full-scale security audit.

    d.   Scan computers on your network to identify and profile the operating system and open network services. If you find services that you don't need, disable them to prevent hacks or other potential security problems.

    e.   Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

    f.   Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email.

    g.   Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

    h.   Configure firewalls to block access to known malicious IP addresses.

    i.   Set anti-virus and anti-malware programs to conduct regular scans automatically.

    j.   Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

    k.   Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

    l.   Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

    m.   Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

n.  Consider disabling Remote Desktop protocol (RDP) if it is not being used.

o.  Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

p.  Execute operating system environments or specific programs in a virtualized environment.

q.  Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.

r.  Conduct an annual penetration test and vulnerability assessment.

s.  Secure your backups.[10]

t.  Identify the computers or servers where sensitive personal information is stored.

u.  Identify all connections to the computers where you store sensitive information. These may include the internet, electronic cash registers, computers at your branch offices, computers used by service providers to support your network, digital copiers, and wireless devices like smartphones, tablets, or inventory scanners.

v.  Don't store sensitive consumer data on any computer with an internet connection unless it's essential for conducting your business.

w.  Encrypt sensitive information that you send to third parties over public networks (like the internet) and encrypt sensitive information that is stored on your computer network, laptops, or portable storage devices used by your employees. Consider also encrypting email transmissions within your business.

x.  Regularly run up-to-date anti-malware programs on individual computers and on servers on your network.

y.  Restrict employees' ability to download unauthorized software. Software downloaded to devices that connect to your network (computers, smartphones, and tablets) could be used to distribute malware.

z.  To detect network breaches when they occur, consider using an intrusion detection system.

aa.  Create a "culture of security" by implementing a regular schedule of employee training. Update employees as you find out about new risks and vulnerabilities.

bb.  Tell employees about your company policies regarding keeping information secure and confidential. Post reminders in areas where sensitive information is used or stored, as well as where employees congregate.

cc.  Teach employees about the dangers of spear phishing—emails containing information that makes the emails look legitimate. These emails may appear to come from someone

---

[10] *How to Protect Your Networks from Ransomware*, at p.3, https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view (accessed June 11, 2024).

within your company, generally someone in a position of authority. Make it office policy to independently verify any emails requesting sensitive information.

dd. Before you outsource any of your business functions investigate the company's data security practices and compare their standards to yours.[11]

31.    The Federal Trade Commission's Standards for Safeguarding Customer Information (the "Safeguards Rule") 16 CFR §314, requires covered financial institutions to develop, implement, and maintain an information security program with administrative, technical, and physical safeguards designed to protect customer information. The primary requirements of an information security program are:

a.    Designate a qualified individual to implement and supervise the information security program.

b.    Conduct an assessment to determine foreseeable risks and threats – internal and external – to the security, confidentiality, and integrity of customer information.

c.    Design and implement safeguards to control the risks identified through the risk assessment.

d.    Regularly monitor and test the effectiveness of the chosen safeguards.

e.    Provide staff with security awareness training and schedule regular refreshers.

f.    Select service providers with the skills and experience to maintain appropriate safeguards. Include security expectations in vendor contracts, monitor the service provider's work, and provide for periodic reassessments of their suitability.

g.    Ensure the information security program remains current. It should reflect changes to operations, changes based on information gained from risk assessments, changes due to emerging threats, changes in personnel, and changes necessitated by other circumstances that may have a material impact on the information security program.

h.    Create a written incident response plan.

i.    Require the "Qualified Individual" to report to the Board of Directors, in writing, at least annually.[12]

///

///

///

---

[11]   *Protecting Personal Information: A Guide for Business*, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (accessed June 11, 2024).

[12]   See,  https://www.ftc.gov/business-guidance/resources/ftc-safeguards-rule-what-your-business-needs-know (last accessed August 7, 2024).

32.      Given that Defendant provides resorts services and collected, used, and stored PII, Defendant could and should have identified the risks and potential effects of collecting, maintaining, and sharing personal information.

33.      Without identifying the potential risks to the personal data in Defendant's possession, Defendant could not identify and implement the necessary measures to detect and prevent cyberattacks.  The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of Plaintiff's and the Class Members' PII.

34.      Defendant knew and understood unencrypted PII is valuable and highly sought after by cybercriminals seeking to illegally monetize that data.  At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding PII and of the foreseeable consequences that would occur if a data breach occurred, including the significant cost that would be imposed on Plaintiff and the Class Members as a result.

### *Plaintiff and Class Members Sustained Damages in the Data Breach*

35.      The invasion of the Plaintiff's and Class Members' privacy suffered in this Data Breach constitutes an actual, particularized, redressable injury traceable to the Defendant's conduct. As a consequence of the Data Breach, Plaintiff and Class Members sustained monetary damages that exceed the sum or value of $5,000,000.00.

36.      Additionally, Plaintiff and Class Members face a substantial risk of future identity theft, fraud, or other exploitation where their names, social security numbers, and dates of birth were targeted by a sophisticated hacker known for stealing and reselling sensitive data on the dark web. The substantial risk of future identity theft and fraud created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

37.      Furthermore, Plaintiff and Class Members face a substantial risk of future spam, phishing, or other attacks designed to trick them into sharing sensitive data, downloading malware, or otherwise exposing themselves to cybercrime, where their names and contact information were acquired in the Data Breach and subsequently released on the dark web.  The substantial risk of future

exploitation created by the Data Breach constitutes a redressable injury traceable to the Defendant's conduct.

38.    Upon information and belief, a criminal can easily link data acquired in the Data Breach with information available from other sources to commit a variety of fraud related crimes.  An example of criminals piecing together bits and pieces of data is the development of "Fullz" packages.[13]  With "Fullz" packages, cyber-criminals can combine multiple sources of PII to apply for credit cards, loans, assume identities, or take over accounts.

39.    Given the type of targeted attack in this case, the sophistication of the criminal claiming responsibility for the Data Breach, the type of PII involved in the Data Breach, the hacker's behavior in prior data breaches, the ability of criminals to link data acquired in the Data Breach with information available from other sources, and the fact that the stolen information has been placed, or will be placed, on the dark web, it is reasonable for Plaintiff and the Class Members to assume that their PII was obtained by, or released to, criminals intending to utilize the PII for future identity theft-related crimes or exploitation attempts.

40.    The substantial risk of future identity theft, fraud, or other exploitation that Plaintiff and Class Members face is sufficiently concrete, particularized, and imminent that it necessitates the present expenditure of funds to mitigate the risk.  Consequently, Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to understand and mitigate the effects of the Data Breach.

41.    For example, the Federal Trade Commission has recommended steps that data breach victims take to protect themselves and their children after a data breach, including: (i) contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity); (ii) regularly obtaining and reviewing their credit reports; (iii)

---

[13] "Fullz" is term used by cybercriminals to describe "a package of all the personal and financial records that thieves would need to fraudulently open up new lines of credit in a person's name."  A Fullz package typically includes the victim's name, address, credit card information, social security number, date of birth, bank name, routing number, bank account numbers and more. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecurity.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm

removing fraudulent charges from their accounts; (iv) closing new accounts opened in their name; (v) placing a credit freeze on their credit; (vi) replacing government-issued identification; (vii) reporting misused Social Security numbers; (viii) contacting utilities to ensure no one obtained cable, electric, water, or other similar services in their name; and (ix) correcting their credit reports.[14]

42.    As a consequence of the Data Breach, Plaintiff and Class Members sustained or will incur monetary damages to mitigate the effects of an imminent risk of future injury.  The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year.  The cost of dark web scanning and monitoring services can cost around $180 per year.

43.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and illegitimate markets, has been damaged and diminished by its unauthorized release.  However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss.  Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

44.    Personal information is of great value, in 2019, the data brokering industry was worth roughly $200 billion.[15]  Data such as name, address, phone number, and credit history has been sold at prices ranging from $40 to $200 per record.[16]  Sensitive PII can sell for as much as $363 per record.[17]

45.    Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain.  By transacting business with Plaintiff and Class Members, collecting their PII, using their PII for profit or to improve the ability to make profits, and then permitting the unauthorized disclosure of the PII, Plaintiff and Class Members were deprived of the benefit of their bargain.

---

[14] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps
[15] *Column: Shadowy data brokers make the most of their invisibility cloak*, https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[16] *In the Dark*, VPNOverview, 2019, available at: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/
[17] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

46.    When agreeing to pay Defendant for products or services, consumers understood and expected that they were, in part, paying for the protection of their personal data, when in fact, Defendant did not invest the funds into implementing reasonable data security practices. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

## CLASS ALLEGATIONS

47.    Plaintiff brings this state and nationwide class action individually, and on behalf of all similarly situated individuals, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

48.    In February 2026, the group ShinyHunters claimed responsibility for accessing Wynn's network and claimed to have more than 800,000 records containing personally identifiable information (including SSNs) and employee data[18].

49.    Wynn Resorts has since been removed from the ShinyHunters website and the company's statement suggests a ransom may have been paid.[19]

50.    Defendant claims that "[u]pon discovery, we immediately activated our incident response protocols and launched a thorough investigation with the help of external cybersecurity experts.  The unauthorized third party has stated that the stolen data has been deleted".[20]

51.    The ShinyHunters group is a cybercrime group who, in the past and as reported here, has stolen PII from other companies.[21]

52.    As of today, undersigned counsel does not believe that Wynn has advised consumers and employees of the scope of the data breach or the underlying cause, other than the statement released.

53.    The Class that Plaintiff seeks to represent is defined as follows:

///

---

[18] https://www.securityweek.com/wynn-resorts-confirms-data-breach-after-hackers-remove-it-from-leak-site/
[19] *Id.*
[20] https://www.ktnv.com/news/wynn-responds-to-recent-lawsuit-in-response-to-data-breach
[21] https://www.bugcrowd.com/glossary/shinyhunters/

**Nationwide Class**:  All individuals residing in the United States whose PII was entrusted to Wynn Resorts, Limited and accessed and acquired by an unauthorized party as a result of the Data Breach, as reported by Defendant.

**Nevada Subclass**:  All individuals residing in the State of Nevada whose PII was entrusted to Wynn Resorts, Limited and accessed and acquired by an unauthorized party as a result of the Data Breach, as reported by Defendant.

54.    The Nationwide Class and Nevada Subclass shall collectively refer to as "the Class."

55.    Excluded from the Class are the following individuals and/or entities:  Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

56.    Plaintiff reserves the right to amend the definitions of the Classes or add a Class or Subclass if further information and discovery indicate that the definitions of the Classes should be narrowed, expanded, or otherwise modified.

57.    <u>Numerosity</u>:  The members of the Classes are so numerous that joinder of all members is impracticable, if not completely impossible.  While the exact number of Class Members is unknown to Plaintiff at this time and such number is exclusively in the possession of Defendant.  According to public reports, the ShinyHunters claims to have over 800,000 records including names, Social Security numbers, and dates of birth.

58.    Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting solely individual members of the Classes.  The questions of law and fact common to the Classes that predominate over questions which may affect individual Class Members, includes the following:

a.    Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.    Whether Defendant had a duty not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c.  Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

d.  Whether Defendant required its third-party vendors to adequately safeguard the PII of Plaintiff and Class Members;

e.  When Defendant actually learned of the Data Breach;

f.  Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.  Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.  Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.  Whether Defendant adequately addressed and fixed the practices, procedures, or vulnerabilities which permitted the Data Breach to occur;

j.  Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendants' wrongful conduct;

k.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and ongoing harm faced as a result of the Data Breach.

59.  <u>Typicality</u>:  Plaintiff's claims are typical of those of the other members of the Classes because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Classes.

60.  <u>Policies Generally Applicable to the Class</u>:  This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Classes, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole.  Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiff.

61.  <u>Adequacy</u>:  Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other Class Members.  Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights, and the damages suffered are typical of other Class

1    Members.  Plaintiff has retained counsel experienced in complex class action and data breach

2    litigation, and Plaintiff intends to prosecute this action vigorously.

3        62.    Superiority and Manageability:  The class litigation is an appropriate method for fair

4    and efficient adjudication of the claims involved.  Class action treatment is superior to all other

5    available methods for the fair and efficient adjudication of the controversy alleged herein; it will

6    permit a large number of Class Members to prosecute their common claims in a single forum

7    simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense

8    that hundreds of individual actions would require.  Class action treatment will permit the adjudication

9    of relatively modest claims by certain Class Members, who could not individually afford to litigate a

10   complex claim against large corporations, like Defendant.  Further, even for those Class Members

11   who could afford to litigate such a claim, it would still be economically impractical and impose a

12   burden on the courts.

13       63.    The nature of this action and the nature of laws available to Plaintiff and Class

14   Members make the use of the class action device a particularly efficient and appropriate procedure to

15   afford relief for the wrongs alleged because Defendant would necessarily gain an unconscionable

16   advantage since Defendant would be able to exploit and overwhelm the limited resources of each

17   individual Class Member with superior financial and legal resources; the costs of individual suits

18   could unreasonably consume the amounts that would be recovered; proof of a common course of

19   conduct to which Plaintiff was exposed is representative of that experienced by the Classes and will

20   establish the right of each Class Member to recover on the cause of action alleged; and individual

21   actions would create a risk of inconsistent results and would be unnecessary and duplicative of this

22   litigation.

23       64.    The litigation of the claims brought herein is manageable.  Defendant's uniform

24   conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class

25   Members demonstrates that there would be no significant manageability problems with prosecuting

26   this lawsuit as a class action.

27       65.    Adequate notice can be given to Class Members directly using information maintained

28   in Defendant's records.

66.     Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Classes, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

67.     Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

68.     Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

   a.   Whether Defendant failed to timely notify the Plaintiff and the Class of the Data Breach;

   b.   Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, sharing, storing, and safeguarding their PII;

   c.   Whether Defendant's (or their vendors') security measures to protect its network were reasonable in light of industry best practices;

   d.   Whether Defendant's (or their vendors') failure to institute adequate data protection measures amounted to negligence;

   e.   Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII;

   f.   Whether Defendant made false representations about their data privacy practices and commitment to the security and confidentiality of customer information; and

   g.   Whether adherence to FTC recommendations and best practices for protecting personal information would have reasonably prevented the Data Breach.

**CAUSES OF ACTION**

**COUNT 1: NEGLIGENCE/WANTONNESS**

69.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

70.     Defendant obtained sensitive PII from its employees, including Plaintiff's and Class Members', in the ordinary course business.

71. Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business. Plaintiff and Class Members were required to entrust Defendant with their PII with the understanding that Defendant would adequately safeguard their information.

72. Defendant had full knowledge of the types of PII it collected and the types of harm that Plaintiff and Class Members would suffer if that data was accessed and exfiltrated by an unauthorized third-party.

73. By collecting, storing, sharing, and using the Plaintiff's and Class Members' PII for commercial gain, Defendant assumed a duty to use reasonable means to safeguard the personal data it obtained.

74. Defendant's information security program must be designed to: (a) ensure the security and confidentiality of customer information; (b) protect against anticipated threats or hazards to the security or integrity of that information; and (c) protect against unauthorized access to that information that could result in substantial harm or inconvenience to any customer.

75. Defendant's duty included a responsibility to ensure it: (i) implemented reasonable administrative, technical, and physical measures to detect and prevent unauthorized intrusions into its information technology and/or cloud environments; (ii) contractually obligated its vendors to adhere to the requirements of Defendant's privacy policy; (iii) complied with the Safeguards Rule and other applicable statutes and data protection obligations; (iv) conducted regular privacy assessments and security audits of Defendant's and/or its vendors' data processing activities; (v) regularly audited for compliance with contractual and other applicable data protection obligations; and, (vi) provided timely notice to individuals impacted by a data breach event.

76. Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair or deceptive trade practices that affect commerce. Deceptive practices, as interpreted by the FTC, include failing to adhere to a company's own published privacy policies.

77. Defendant had a duty to exercise appropriate clearinghouse practices to remove PII that Defendant was no longer required to retain.

78.     Defendant had a duty to notify Plaintiff and the Classes of the Data Breach promptly and adequately.  Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any fraudulent usage of their PII.

79.     Defendant violated Section 5 of the FTC Act by failing to adhere to its own privacy policy regarding the confidentiality and security of Plaintiff and Class Members information. Defendant further violated Section 5 of the FTC Act, the Safeguards Rule, and other state consumer protection statutes by failing to implement an information security plan or use reasonable security measures to protect PII.  Defendant's violations of Section 5 of the FTC Act, the Safeguards Rule, and other state consumer protection statutes, constitute negligence and/or wantonness.

80.     Defendant's failure to adhere to its data privacy and security obligations was a reckless disregard for the Plaintiff's and Class Members' privacy rights.  Defendant knew, or should have known, that its failure to take reasonable precautions might result in injury to Plaintiff and Class Members.  The negligent and wanton acts or omissions committed by Defendant includes, but is not limited to, the following:

    a.  Failing to designate a qualified individual to implement and supervise its information security program.

    b.  Failing to conduct an assessment to determine foreseeable risks and threats – internal and external – to the security, confidentiality, and integrity of customer information.

    c.  Failing to design and implement safeguards to control the risks identified through the risk assessment.

    d.  Failing to encrypt personally identifying information in transit and at rest.

    e.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII.

    f.  Failing to adequately monitor the security of their networks and systems.

    g.  Allowing unauthorized access to PII.

    h.  Failing to detect in a timely manner that PII had been compromised.

    i.  Failing to remove former customers' PII it was no longer required to retain.

    j.  Failing to timely and adequately notify Plaintiff and Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

81.     Plaintiff and Class Members are within the class of persons the Federal Trade Commission Act and the Safeguards Rule were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statue was intended to guard against.

82.     The injuries resulting to Plaintiff and the Classes because of Defendant's failure to use adequate security measures was reasonably foreseeable.

83.     Plaintiff and the Classes were the foreseeable victims of a data breach. Defendant knew or should have known of the inherent risks in collecting and storing PII, the critical importance of protecting that PII, and the necessity of updating, patching, or fixing critical vulnerabilities in its network.

84.     Plaintiff and the Class had no ability to protect the PII in Defendant's possession. Defendant was in the best position to protect against the harms suffered by Plaintiff and the Class as a result of the Data Breach.

85.     But for Defendant's breach of duties owed to Plaintiff and the Class, their PII would not have been compromised.  There is a close causal connection between Defendants' failure to implement reasonable security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class.

86.     As a result of the Data Breach, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data remains unencrypted and available for unauthorized third parties to access; and (b) remains backed up under Defendant's possession or control and is subject to further unauthorized disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect the PII.

87.     Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

88. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to provide adequate credit monitoring to all affected by the Data Breach.

### COUNT 2: BREACH OF IMPLIED CONTRACT

89. Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

90. Defendant obtained sensitive PII from their customers and employees, including Plaintiff's and Class Members in the ordinary course of business.

91. In so doing, Plaintiff and Class Members entered implied contracts with Defendant by which Defendant agreed to use reasonable technical, administrative, and physical safeguards to protect against unauthorized access to, use of, or disclosure of the personal information it collects and stores.

92. Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of an expressed or implied promise to implement reasonable data protection measures.

93. Plaintiff and Class Members fully and adequately performed their obligations under the implied contract with Defendant.

94. Defendant breached the implied contract with Plaintiff and Class Members which arose from the course of conduct between the parties, as well as disclosures on the Defendant's web site, privacy policy, and in other documents, all of which created a reasonable expectation that the personal information Defendant collected would be adequately protected and that the Defendant would take such actions as were necessary to prevent unauthorized access to, use of, or disclosure of such information.

95. As a direct and proximate result of the Defendant's breach of an implied contract, Plaintiff and Class Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and increased risk their PII will be misused,

1    where: (a) their data remains unencrypted and available for unauthorized third parties to access; and

2    (b) remains backed up under Defendant's possession or control and is subject to further unauthorized

3    disclosures so long as Defendant fails to implement appropriate and reasonable measures to protect

4    the PII.

5    96.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant

6    to: (i) strengthen its data protection procedures; (ii) patch all critical vulnerabilities; and (iii) to

7    provide adequate credit monitoring to all affected by the Data Breach.

8    **COUNT 3: UNJUST ENRICHMENT**

9    97.    Plaintiff re-alleges and incorporates by reference all the allegations contained in the

10    foregoing paragraphs as if fully set forth herein.

11    98.    Plaintiff brings this Count in the alternative to the breach of implied contract count

12    above.

13    99.    By obtaining their PII from Defendant's customers and employees, Plaintiff and Class

14    Members conferred a monetary benefit on Defendant. Defendants used Plaintiff's and Class

15    Members' PII to provide resorts services, for profit, to its customers. Defendant knew that Plaintiff

16    and Class Members conferred a benefit upon them and has accepted and retained that benefit.

17    100.    By collecting the PII, Defendant was obligated to safeguard and protect such

18    information, to keep such information confidential, and to timely and accurately notify Plaintiff and

19    Class Members if their data had been compromised or stolen.

20    101.    Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, it would

21    be unjust for Defendant to retain any of the benefits that Plaintiff and Class Members conferred upon

22    Defendant without paying value in return.

23    102.    As a direct and proximate result of the Defendant's conduct, Plaintiff and Class

24    Members suffered injuries including, but not limited to: (i) invasion of privacy; (ii) theft of their PII;

25    (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to

26    mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi)

27    experiencing an increase in spam calls, texts, and/or emails; (vii) statutory damages; (viii) nominal

28    damages; and (ix) the continued and increased risk their PII will be misused, where: (a) their data

1    remains unencrypted and available for unauthorized third parties to access; and (b) remains backed

2    up under Defendant's possession or control and is subject to further unauthorized disclosures so long

3    as Defendants fail to implement appropriate and reasonable measures to protect the PII.

4         103.    Plaintiff and Class Members are entitled to restitution, and/or damages from Defendant

5    and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by

6    Defendant from its wrongful conduct.

7                          **COUNT 4: INVASION OF PRIVACY**

8         104.    Plaintiff re-alleges and incorporates by reference all the allegations contained in the

9    foregoing paragraphs as if fully set forth herein.

10        105.    Plaintiff and Class Members had a legitimate expectation of privacy in their

11   personally identifying information such as social security numbers, dates of birth, and financial

12   information. Plaintiff and Class Members were entitled to the protection of this information from

13   disclosure to unauthorized third parties.

14        106.    Defendant owed a duty to Plaintiff and Class Members to keep their PII confidential.

15        107.    Defendant permitted the public disclosure of Plaintiff's and Class Members' PII to

16   unauthorized third parties.

17        108.    The PII that was disclosed without the Plaintiff's and Class Members' authorization

18   was highly sensitive, private, and confidential. The public disclosure of the type of PII at issue here

19   would be highly offensive to a reasonable person of ordinary sensibilities.

20        109.    Defendant permitted its information technology environment to remain vulnerable to

21   foreseeable threats, which created an atmosphere for the Data Breach to occur. Despite knowledge

22   of the substantial risk of harm created by these conditions, Defendant intentionally disregarded the

23   risk, thus permitting the Data Breach to occur.

24        110.    By permitting the unauthorized disclosure, Defendant acted with reckless disregard

25   for the Plaintiff's and Class Members' privacy, and with knowledge that such disclosure would be

26   highly offensive to a reasonable person. Furthermore, the disclosure of the PII at issue was not

27   newsworthy or of any service to the public interest.

28

111.     Defendant was aware of the potential of a data breach and failed to adequately safeguard its systems and/or implement appropriate policies and procedures to prevent the unauthorized disclosure of Plaintiff's and Class Members' data.

112.     Defendant acted with such reckless disregard as to the safety of Plaintiff's and Class Members' PII to rise to the level of intentionally allowing the intrusion upon the seclusion, private affairs, or concerns of Plaintiff and Class Members.

113.     Plaintiff and Class Members have been damaged by the invasion of their privacy in an amount to be determined at trial.

**COUNT 5: NEVADA DECEPTIVE TRADE PRACTICE ACT**
**(NRS § 598.0915 et. seq.)**
**(On behalf of the Nevada Subclass)**

114.     Plaintiff re-alleges and incorporates by reference all the allegations contained in the foregoing paragraphs as if fully set forth herein.

115.     At all relevant times, Defendant was engaged in trade or commerce within the State of Nevada and in the course of its business operations collected, maintained, stored, and processed ("PII") belonging to its employees and customers, including PII belonging to employees and customers, including Plaintiff and members of the proposed Class.

116.     Defendant represented to Plaintiff and Class Members, expressly and implicitly through its policies, statements and course of conduct, that it had reasonable and adequate safeguards to protect the confidentiality, integrity, and security of the sensitive PII entrusted to it.

117.     Defendant failed to implement and maintain reasonable data security practice and safeguards consistent with industry standards and applicable regulatory guidance, leaving Plaintiff's and Class members' PII vulnerable to unauthorized access by cybercriminals.

118.     As a result of Defendant's omissions, cybercriminals were able to access and exfiltrate a database containing approximately 800,000 records of sensitive information and PII of Defendant's employee customer data belonging to Defendant, including Plaintiff's PII.

119.     Defendant's conduct constitutes a deceptive trade practice under NRS § 598.0915 et. seq., including, but not limited to:

a.  Knowingly making false representations as to characteristics, uses, benefits, or status of its services;

b.  Representing that its services were of a particular standard, quality, or grade when Defendant knew or should have known that they were not, including the adequacy of its cybersecurity safeguards;

c.  Knowingly making false or misleading representations in connection with transactions involving its services, including representations concerning the safety and protection of the PII entrusted to it.

120.    Defendant knew or should have known that its representations regarding the protection of sensitive PII were false or misleading because it failed to implement basic, reasonable cybersecurity protections that would have prevented the risk of unauthorized access.

121.    Plaintiff and Class Members relied on Defendant's representations and omissions related to the security of their sensitive personal information when providing their PII to Defendant in connection with their employment or transactions with Defendant.

122.    As a direct and proximate result of Defendant's deceptive trade practices, Plaintiff and Class Members suffered damages like limited loss of the value of their personal information, out-of-pocket expenses for identity theft monitoring and mitigation, lost time responding to the Data Breach, and the continued risk of identity theft and fraud.

123.    Plaintiff and Class Members are entitled to restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the other members of the Classes alleged herein, respectfully requests that the Court enter judgment as follows:

1.  For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative for the Classes and counsel for Plaintiff as Class Counsel;

2.   For an order declaring the Defendant's conduct violates the statutes and causes of action referenced herein;

3.   For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

4.   Ordering Defendant to pay for lifetime credit monitoring and dark web scanning services for Plaintiff and the Classes;

5.   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

6.   For prejudgment interest on all amounts awarded;

7.   For an order of restitution and all other forms of equitable monetary relief requiring the disgorgement of the revenues wrongfully retained as a result of the Defendant's conduct;

8.   For injunctive relief as pleaded or as the Court may deem proper; and

9.   For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit, and any other expense, including expert witness fees; and

10.  Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims in this Complaint and of all issues in this action so triable as of right.

Dated this 10th day of March 2026.

**MATTHEW L. SHARP, LTD.**


   */s/ Matthew L. Sharp*
Matthew L. Sharp, Esq.
State Bar No. 4746
432 Ridge St.
Reno, NV 89501
matt@mattsharplaw.com

Paul J. Doolittle (pro hac forthcoming)
**POULIN | WILLEY | ANASTOPOULO**
32 Ann St.
Charleston, SC 29403
paul.doolittle@poulinwilley.com
cmad@poulinwilley.com

*Attorneys for Plaintiff and Proposed Class*